IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WILLIAM A. FINCH, IV, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | Case No. 3:12-cv-01104 |
| v. ) | Judge Campbell / Knowles |
| ) | |
| REGIONS BANK, ) | |
| ) | |
| DEFENDANT. ) | |

# REPORT AND RECOMMENDATION

This matter is before the Court upon Defendant's Motion for Summary Judgment. Docket No. 23. Defendant has attached to its Motion for Summary Judgment 10 Exhibits as follows:

> Exhibit A - Deposition of Shane Finch, Part I of II (Docket No. 23-1);
> Exhibit A (again) - Deposition of Shane Finch, Part II of II (Docket No. 23-2);
> Exhibit B - Defendant's Responses to Cited Interrogatories (Docket No. 23-3);
> Exhibit C - Excerpts from the Deposition of Charles Mader (Docket No. 23-4);
> Exhibit D - Excerpts from the Deposition of Gayle Kindig (Docket No. 23-5);
> Exhibit E - Excerpts from the Deposition of Joseph Campopiano (Docket No. 23-6);
> Exhibit F - Excerpts from the Deposition of Ellie Teed (Docket No. 23-7);
> Exhibit G - Excerpts from the Deposition of Tamra Green (Docket No. 23-8);
> Exhibit H - Excerpts and Exhibits from the Deposition of Patrick Chandler (Docket No. 23-9); and
> Exhibit I - Excerpts and Exhibits from the Deposition of Rena Ramsey (Docket No. 23-10).

*Id.*

Defendant has contemporaneously filed a supporting Memorandum of Law (Docket No. 24), and a Statement of Undisputed Material Facts (Docket No. 25). Additionally, with leave of Court, Defendant has filed 15 documents under seal. *See* Docket Nos. 28, 29.

Plaintiff has filed a Response in Opposition to the instant Motion. Docket No. 33. Plaintiff has submitted 6 attachments with his Response. Docket Nos. 33-1 through 33-6. Those attachments are as follows:

    Attachment 1 - Deposition of William Finch Volume I (Docket No. 33-1);
    Attachment 2 - Deposition of William Finch Volume II (Docket No. 33-2);
    Attachment 3 - Deposition of Joseph Campopiano (Docket No. 33-3);
    Attachment 4 - Deposition of Charles Mader (Docket No. 33-4);
    Attachment 5 - Deposition of Gayle Kindig (Docket No. 33-5); and
    Attachment 6 - Deposition of Rena Ramsey (Docket No. 33-6).

*Id.*

Plaintiff has also filed a Response to Defendant's Statement of Undisputed Material Facts (Docket No. 34), along with his own Statement of Undisputed Material Facts (Docket No. 35).

Defendant has filed a Reply to Plaintiff's Response (Docket No. 36), and has filed a Response to Plaintiff's Statement of Undisputed Material Facts (Docket No. 37).

Plaintiff filed this employment discrimination action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5 ("Title VII"), alleging that Defendant discriminated against him on account of his gender and retaliated against him for engaging in protected activity. Docket Nos. 1, 7, Complaint and Amended Complaint. Specifically, Plaintiff, in his Amended Complaint, avers that he worked as a mortgage loan officer for Defendant; that the 3 Wilson County bank branches he was hired to serve were referring their mortgage loans to a female loan officer who had worked for Defendant for "several years"; that Plaintiff repeatedly expressed his concerns over the loan referrals to his manager, but that no action was taken; that he was able to obtain loan referrals from a branch that had a vacancy until that vacancy was filled, at which time he was no longer able to get loan referrals from them; and that Defendant hired a female to fill said vacancy, and gave her 9 branches to service. Docket

No. 7, p. 2. Plaintiff avers that the disparity in the number of branches served and referral distribution made it "virtually impossible for him to keep his performance numbers competitive with the female employees who were receiving the large majority of referrals." *Id.* Plaintiff states that he received a written warning from his manager, Joe Campopiano, advising him that he had 3 months to "get his numbers up." *Id*, p. 3. Plaintiff further states that, prior to the end of the 3 month performance improvement period, Mr. Campopiano left his employment with Defendant, and was replaced by Ms. Gayle Kindig, a female. *Id.* Plaintiff avers that Ms. Kindig, his new manager, met with him and gave him a final warning regarding his work, advising him that if he did not improve, he would lose his job. *Id.* Plaintiff states that Ms. Kindig further advised him that "it would be a good idea for him to start looking for other employment." *Id.*

Plaintiff filed EEOC Charge of Discrimination No. 494-2012-00245 on December 16, 2011. *Id.* Plaintiff reports that, in February 2012, he was placed on a 3 month Performance Improvement Plan, and that his supervisor advised him that he was meeting his production goals during that time. *Id.*, p. 3-4. Plaintiff avers that despite meeting these production goals, he was fired on May 24, 2012. *Id.* Plaintiff contends that he was fired in retaliation for filing his December 16, 2011, EEOC Charge of Discrimination. *Id.*

Plaintiff filed two different EEOC Charges of Discrimination, and received Right to Sue letters for both. Docket No. 1. This action was timely-filed. Plaintiff seeks compensatory damages, reinstatement, back pay, front pay, attorney's fees, and costs. *Id.* Plaintiff also asks that this Court permanently enjoin "the defendant, as officers, successors, assigns and all persons in active consort or participation with it, from engaging in employment practice which discriminates on the basis of age, gender, and/or disability." *Id.*

Defendant filed the instant Motion and supporting materials arguing that it is entitled to Summary Judgment because "the undisputed material facts establish Plaintiff suffered no adverse action because of his gender or alleged protected activity; that he was not treated differently than other employees on the basis of gender, and Regions had legitimate, non-discriminatory and non-retaliatory motives for all of its interactions with Plaintiff." Docket No. 23, p. 1.

Plaintiff, in his Response, contends that the facts alleged are sufficient "background circumstances supporting the suspicion of discrimination" and its requisite elements so as to preclude summary judgment. Docket No. 33, p. 13-16. Plaintiff also contends that the facts alleged constitute sufficient circumstantial evidence to support his claims of retaliation such that granting summary would be inappropriate. *Id.*, p. 16-18.

Defendant, in its Reply, asserts that Plaintiff cannot establish a prima facie case of discrimination because: (1) he has failed to identify any adverse action taken against him by Defendant, and he was not subjected to any such adverse action; (2) he has failed to provide evidence that such alleged action was either motivated by gender discrimination or was solely motivated by some protected conduct; (3) "Despite Plaintiff's best efforts to manufacture questions of fact," he was not treated less favorably than similarly-situated females; (4) he was not subjected to retaliation; and (5) Defendant had legitimate, non-discriminatory and non-retaliatory business reasons for all of its dealings with him. Docket No. 36, p. 1. Defendant also asserts that "Plaintiff's case hinges merely on subjective opinions – that [Defendant] should have given each MLO exactly the same number of branch assignments, regardless of geography or size of each branch; and that employees at his assigned branches should have been *required* to

4

direct all loan customers to him, regardless of whether this was the Company's practice and regardless of whether it applied to others." *Id*, p. 1-2 (internal citations omitted, emphasis original). Defendant argues, "Plaintiff's disagreement with [Defendant's] referral model simply does not constitute a Title VII violation." *Id.*, p. 2. Defendant further argues, "Regardless of his objection to [Defendant's] branch assignments and referral practices, [Plaintiff] offers no evidence to demonstrate he was treated less favorably *on the basis of his gender*." *Id.* (emphasis original).

With regard to Plaintiff's retaliation claim, Defendant replies,

> Indeed, Plaintiff concedes in all respects that [Defendant] had legitimate, non-retaliatory reasons for putting him on this [performance improvement plan]. He concedes that the performance criteria on which his final written warning was based were accurate, he is unaware of any other MLOs in similar situations who did not receive the same warning, he has no proof that the warning was in retaliation for any protected conduct, and he believed the goals on the performance improvement plan were achievable.
>
> Likewise, Plaintiff can put forth nothing but pure speculation to support his allegation that his loans were purposely "slow walked" in April 2011 to prevent him from hitting his performance improvement plan targets. The facts show that "everyone in the group" complained about loan processing time and he has no proof to suggest that [Defendant's] management directed delays regarding his loans. To the contrary, when Plaintiff complained about the performance of his loan processors, he was promptly assigned another processor.

*Id.*, p. 4-5. (internal citations omitted).

Noting that "Plaintiff voluntarily resigned from Regions with a track record of consistently poor performance, despite being given repeated opportunities for improvement," Defendant argues that, "[e]ven construed in a light most favorable to the Plaintiff, the undisputed

5

facts establish that his claims are wholly without merit and must be dismissed as a matter of law." *Id.*, p. 5.

For the reasons discussed below, the undersigned concludes that there are no genuine issues of material fact and that Defendant is entitled to a judgment as a matter of law. Accordingly, the undersigned recommends that Defendant's Motion for Summary Judgment be GRANTED.

## **II.  Undisputed Facts[1]**

In January 2009, Defendant hired Plaintiff as a Mortgage Loan Officer ("MLO") in the Rutherford County Production Office. Docket Nos. 23-1, 23-2, 33-1, 33-2, Plaintiff's Deposition ("Plaintiff's Dep."), 57:8-110; 72:02-06. Defendant wanted a business plan developed by every MLO, every year. *Id.*, 209:21-210:4. Also, at the beginning of each year of his employment, Plaintiff was to sign (and did so sign) an MLO Compensation Plan that stated,

> The primary duty of the MLO is to develop new mortgage
> production for the corporation. In order to fulfill responsibilities,
> the MLO is required to make outside sales calls on a regular basis
> to existing relationships, as well as with new business customers.

Plaintiff's Dep., Ex. 4, 7 at ¶ 10.

Then-Mortgage Production Manager for Defendant's East Middle Tennessee Division, Mr. Joseph Campopiano, told Plaintiff that he would be assigned branches and that the branch personnel would internally refer loans to him. *Id.*, 22:07-15. Plaintiff understood that Defendant expected him to also generate his own customer referrals, and he received no guarantee either that he would be successful without finding his own business contacts, or that branch employees

---

[1] Unless otherwise noted, the following facts are in a form required by Fed. R. Civ. P. 56, and are undisputed.

would be required to send him every loan or were prohibited from referring loans to anyone but him. *Id.*, 22:16-23:3; 69:3-70:9. Defendant had an "open architecture" referral practice that allowed branch employees to use their discretion to send internal referrals to the MLO they believed would best serve the particular customer's needs. Docket Nos. 23-4, 33-4, Deposition of Charles Mader ("Mader Dep."), 39:4-40:4; Docket No. 23-8, Deposition of Tamra Green ("Green Dep."), 23:9-19; Docket No. 23-9, Deposition of Patrick Chandler ("Chandler Dep."), 163:25-164:20, 223:23-25, 237:18-238:1; Docket No. 23-7, Deposition of Ellie Teed ("Teed Dep."), 26:6-27:6; Docket Nos. 23-10, 33-6, Deposition of Rena Ramsey ("Ramsey Dep."), 40:5-18. This "open architecture" referral practice was widespread. Deposition of Gayle Kindig ("Kindig Dep."), 44:5-12.

Defendant established line of business relationships between MLOs and its bank branches that were intended to ensure that each branch had some level of mortgage service, to service walk-in mortgage customers, and to introduce MLOs to a potential source of mortgage referrals. Docket No. 23-3, Defendant's Response to Plaintiff's First Set of Interrogatories ("Def.'s Resp. to Pl.'s 1st Interrog.") No. 8; Mader Dep., 37:10-38:30.

Branch assignments were made by Middle Tennessee Manager, Ms. Gayle Kindig, Mr. Campopiano, and Mr. Campopiano's counterpart in the Nashville Territory, Mr. John Whitaker. Docket Nos. 23-6, 33-3, Deposition of Joseph Campopiano ("Campopiano Dep."), 33:13-25; 34:1-12. Branch relationship allocations could be affected by such things as the size of the branch, the dollar volume that could reasonably be expected to come from each branch, and whether an MLO may have business or personal connections in a particular geographic area that may help generate business. Def.'s Resp. to Pl.'s 1st Interrog. No. 8; Campopiano Dep., 33:10-

35:11; Docket Nos. 23-5, 33-5, Kindig Dep., 15:15-16:22, 28:21-29:4.

Plaintiff was assigned as the MLO at 3 branches: South Mt. Juliet/Providence (managed by Tamra Green), North Mt. Juliet (managed by Eddie Russell and later by Trey Wesson), and Lebanon (managed by Julia Blaker). Plaintiff's Dep., 117:4-7; 128:8-129:12; 132:18-22. The 2 Mt. Juliet branches to which Plaintiff was assigned were more affluent and the Lebanon branch to which he was assigned was average, compared to other Rutherford branches. *Id*., 117:8-119. Plaintiff tried to solicit loans from other branches as well, because Mr. Campopiano told him to go find other sources of business. *Id.*, 127:25-128:05. Plaintiff was referred loan opportunities from branches other than those to which he was assigned. *Id.*, 61:05-08. Plaintiff believes he received internal referrals from approximately 6 female employees at various branches, including from Ms. Green and Ms. Blaker. *Id.*, 140:14-141:13.

Ms. Green instructed the employees at her branch that they could refer mortgage customers to whichever MLOs they preferred. Green Dep., 30:14-31:24. Early in his employment with Defendant, Ms. Green sent customer referrals to Plaintiff, including a realtor who had sent her branch a significant amount of business in the past. *Id.*, 132:23-25; Green Dep., 38:8-39:12. Ms. Green informed Plaintiff that this was his "big chance" to create a good relationship with a strong referral source. Green Dep., 38:8-39:12. Ms. Green was displeased with Plaintiff's handling of the realtor she had referred to him. Plaintiff's Dep., 204:8-15; Green Dep., 38:8-39:12. Ms. Green believed that other potential customers were also unhappy with Plaintiff's customer service, and felt that Plaintiff did not do enough to get to know the employees at her branch. Green Dep., 30:14-31:24, 37:2-17. Ms. Green then sent referrals to Ms. Teed because Ms. Green believed she called customers promptly, was effective in closing

8

deals, and received good customer feedback. *Id.*, 33:19-34:2.

Plaintiff went to Mr. Campopiano on several occasions to speak with him regarding why one of his branches was not sending him loans. Plaintiff's Dep., 21:10-16. Mr. Campopiano explained that he could not do anything about that, but instructed him to go to other branches and other referral sources to obtain loans, which Plaintiff did. *Id.*; 199:8-14; 199:24-200:7. Plaintiff began making calls and opportunities were afforded him elsewhere. *Id.*, 61:8-13. He began driving to Cookeville and McMinnville, and was developing relationships. *Id.*

Plaintiff assumed that Mr. Wesson and Mr. Russell sent referrals to other MLOs, but he does not contend that these referrals were based on gender. Plaintiff's Dep., 128:18-129:6. Plaintiff has no evidence that, if Ms. Blaker referred customers to other MLOs, those referrals were motivated by gender. *Id.*, 132:2-8. No one at Defendant made comments about Plaintiff's gender, or told him that he would not or did not receive a referral because of his gender. *Id.*, 144:9-19.

Throughout his employment with Defendant, Plaintiff had customer service issues, which he does not contend Defendant manufactured, were made because of his gender, or were mishandled by Defendant. *Id.*, 144:20-145:5, 151:17-177:6, Ex. 9-22. Plaintiff's 2009 performance review was not affected by his gender. *Id.*, 177;7-17, 178:21-24, Ex. 23. Plaintiff did not fulfil his business plan for 2010 because he did not close the necessary amount of loans to do so. *Id.*, 209:21-210:4, 210:15-211:6. Plaintiff concedes his 2010 performance review was neither discriminatory nor retaliatory. *Id.*, 188:3-25, 190:15-191:5, Ex. 27.

In February 2011, Mr. Campopiano put Plaintiff on a 3 month action plan because he was not meeting his monthly production goals. *Id.*, 180:16-181:1, Ex. 24. Mr. Campopiano gave

9

Plaintiff a written warning based upon 3 negative customer evaluations and an unacceptable customer service score in 2010. *Id.*, 184:3-186:12, Ex. 25. Plaintiff articulated no basis to contend this written warning constituted discrimination or retaliation. *Id.*, 186:6-12.

On May 11, 2011, Ms. Kindig gave Plaintiff a final written warning, in which she noted that only 1 of the 4 target goals from his February 2011 action plan had been achieved. *Id.*, 191;6-22, Ex. 28. The assessment in the May 11, 2011 final written warning was accurate, and Plaintiff does not believe the final written warning was discriminatory. *Id.*, 192:8-18.

On May 24, 2011, Plaintiff sent an email to Mr. Mader complaining that referrals were being made from his assigned branches to female MLOs and that branches were allocated unfairly. *Id.*, 193:2-11, 193:20-194:10, Ex. 29. Human Resource Manager Marlene Akin met with Plaintiff in June 2011 to follow-up on Plaintiff's email to Mr. Mader. *Id.*, 255:25-256:11, Ex. 38.

Plaintiff did not fulfil his business plan for 2011 because he did not close the necessary amount of loans to do so. *Id.*, 209:21-210:4, 210:15-211:6. In June 2011, Plaintiff was on a list of poor-performing MLOs who were slated for termination because they were among the bottom 5% of MLOs. Ramsey Dep., 19:21-21:23, Exs. 1, 2. Because Plaintiff's complaint had not yet been resolved, Ms. Ramsey, Human Resources Manager for Mortgage and Consumer Lending, advised Ms. Kindig not to proceed with terminating Plaintiff's employment at that time. *Id.*, 31:1-23, Ex. 2.

On July 15, 1011, Plaintiff and Ms. Akin met with Mr. Mader regarding Plaintiff's complaint. Plaintiff's Dep., 259:11-260:4, Ex. 39. Ms. Kindig also arranged a meeting between Plaintiff and Ms. Green to try and improve their working relationship. *Id.*, 265:15-266:21;

10

Kindig Dep., 45:17-47:21, 46:10-47:16. Following the meeting, Ms. Green sent referrals to Plaintiff. Plaintiff's Dep., 133:14-134:2.

Plaintiff asked to be included in an automated rotation of MLOs to receive call-in referrals, and Ms. Kindig added him to that rotation. *Id.*, 123:18-127:4, Ex. 8.

In his 2011 performance evaluation, Plaintiff met only 49% of his closed loan volume goal and was below target on his customer service score, closing attendance, cross-sell and pull-through ration. *Id.*, Ex. 30. Plaintiff does not contend that his 2011 evaluation was inaccurate or based on his gender, nor does he have any factual basis to allege that Ms. Kindig was retaliating against him by giving him this evaluation. *Id.*, 207:19-209:1.

On January 24, 2012, Ms. Kindig gave Plaintiff a renewed final warning and an action plan for improved performance. *Id.*, 215:6-9, 216:13-15, Exs. 32, 33. The numbers on which this final warning was based were accurate; the warning was not given to Plaintiff because of his gender; and he is unaware of any other MLOs in similar situations who did not receive a final written warning. *Id.*, 216:1-9. Plaintiff has no proof that his final written warning was given in retaliation for any protected conduct, and he believed that the goals of his action plan were achievable. *Id.*, 216:10-12, 217:2-3. Ms. Kindig continued her efforts to obtain more referrals for Plaintiff during this period, and did, in fact, get him more referrals. *Id.*, 220:22-221:9.

Defendant's computer application system called "Empower" was the system its MLOs had to learn to navigate in order to close loans. Plaintiff's Dep., 79:14-80:01. Plaintiff had difficulty working with Empower and it affected his loan closings by slowing the loan process down and locking up. *Id.*, 81:20-82:24. Empower was cumbersome and hampered employees' efforts with respect to Defendant's loans. *Id.*, 84:18-21. Other MLOs also complained about

Empower. *Id.*, 83:16-17. While Plaintiff worked for Defendant, every MLO in the group complained about the length of time it took for loans to close. *Id.*, 101:21-102:01. Plaintiff concedes that "everyone in the group" complained about loan processing times and has no proof that Defendant's management directed that his loan processing be delayed. *Id.*, 101:21-102:1-13, 221:13-224:2. Empower was the only system Defendant used during Plaintiff's employ. *Id.*, 81:20-82:24.

On more than one occasion, when Plaintiff complained about various loan processors' performance, Plaintiff was assigned another processor. *Id.*, 98:19-99:9, 99:20-25, 100:1-23.

Ms. Ellie Teed, a female MLO, had been assigned to as few as 1 branch during her employment with Defendant, and, at the time of her deposition, had 3 branches assigned to her. Teed Dep., 7:15-8:5, 9:20-25, 16:2-5.

In addition to Plaintiff, at least 2 other male MLOs had been assigned as MLOs to Ms. Green's branch at different times. Green Dep., 21:23-25.

On May 24, 2012, Plaintiff submitted a letter of resignation to Ms. Akin and Ms. Kindig, resigning his employment with Defendant. Plaintiff's Dep., 275:9-12, Ex. 34.

### III. Applicable Law and Analysis

**A. Motion for Summary Judgment**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

12

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for summary judgment, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the nonmoving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If a nonmoving party, however, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273. When this occurs, the moving party is entitled to summary judgment as a matter of law. *Id.* at 322-23, 106 S. Ct. at 2552; *Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999).

### B.  Title VII of the Civil Rights Act of 1964

#### 1.  Generally

Title VII of the Civil Rights Act of 1964 ("Title VII") protects employees from discrimination on the basis of an individual's race, color, religion, sex, or national origin, and

provides, in part:

> It shall be an unlawful employment practice for an employer--
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.

Federal courts do not have jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998) (*citing Ang v. Procter & Gamble Co.,* 932 F.2d 540, 544-45 (6th Cir. 1991)). Thus, as a prerequisite to bringing a Title VII discrimination claim in federal court, a claimant is required to file a charge of discrimination or retaliation with the EEOC and is precluded from seeking judicial review until the Commission has made a final disposition of his claim. 42 U.S.C. § 2000e-5. *See also, United Air Lines, Inc. v. Evans*, 431 U.S. 553, 554, 97 S. Ct. 1885, 1887, 52 L. Ed. 2d 571 (1977). The wording of the allegations in the EEOC charge does not, however, have to be exact or all-encompassing; rather, the court may consider allegations not explicitly stated in the EEOC charge if those allegations could reasonably be expected to grow out of the charge of discrimination. *Tipler v E. I. du Pont de Nemours & Co.*, 433 F.2d 125, 131 (6th Cir. 1971) (*citing Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 465-66 (5th Cir. 1970); *King v.*

*Georgia Power Co.*, 295 F.Supp. 943 (N.D. Ga. 1968)).

## 2. Prima Facie Case of Discrimination

In order to establish a prima facie case of discrimination in violation of Title VII, a plaintiff must prove that:

>1) he is a member of a protected class;
>
>2) he was qualified for his job and performed it satisfactorily;
>
>3) despite his qualifications and performance, he suffered an adverse employment action;[2] and
>
>4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.

*Johnson v. University of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)) (footnote added).

A plaintiff may establish a claim of discrimination under Title VII either by introducing direct evidence of discrimination, or by proving circumstantial evidence that would support an inference of discrimination. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000), *citing Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997). "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Id.*

Under the direct evidence approach, once the plaintiff introduces evidence that the employer terminated him because of his protected status, the burden of persuasion shifts to the

---

[2] An adverse employment action is one that causes a materially adverse change in a term of employment, such as significantly diminished responsibilities, termination, a demotion evidenced by a decrease in wage or salary, a less distinguished title, or a material loss of benefits. *See Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885-86 (6th Cir. 1996).

employer to prove that it would have terminated the plaintiff even had it not been motivated by discrimination. *Johnson*, 215 F.3d at 572, *citing Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994) (*citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)).

If the plaintiff lacks direct evidence of discrimination, the circumstantial evidence approach is used and the *McDonnell Douglas-Burdine* tripartite test is employed. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as later clarified by *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The *McDonnell Douglas-Burdine* tripartite test requires the plaintiff to first establish a prima facie case of discrimination. *Id.* If the plaintiff is able to do so, a mandatory presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Id.* If the defendant carries this burden, the plaintiff must then show that the proffered reason was actually pretextual. *Id.* The plaintiff may establish pretext by showing that, 1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; or 3) the stated reasons were insufficient to explain the defendant's action. *Id. See also, Cicero v. Borg-Warner Automotive, Inc.,* 280 F.3d 579, 589 (6th Cir. 2002). "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

### 3. Prima Facie Claim of Retaliation

An employer may not retaliate against an employee because he has opposed an unlawful

16

employment practice, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3(a). A prima facie case of retaliation requires a plaintiff to demonstrate that:

1. he engaged in a protected activity;

2. the defendant knew that the plaintiff was exercising protected rights;

3. the plaintiff suffered an adverse employment action or was subjected to severe or pervasive retaliatory harassment by a supervisor; and

4. there was a causal connection between the protected activity and the adverse employment action or harassment.

*Little v. BP Exploration and Oil Co.,* 265 F.3d 357, 363 (6th Cir. 2001); *Morris v. Oldham Co. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

Retaliation claims are evaluated under the *McDonnell Douglas-Burdine* tripartite test discussed above. *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 862 (6th Cir. 1997).

**C. The Case At Bar**

As has been noted, in order for Plaintiff to establish a prima facie claim of discrimination in violation of Title VII, he must establish all of the following: 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. *Johnson*, *supra*; *McDonnell Douglas Corp., supra*. As set forth above, the undisputed facts demonstrate that Plaintiff did not perform his job satisfactorily because, *inter alia*: he did not fulfil his business plan in 2010, 2011, or 2012; he

was twice put on action plans because he was not meeting his goals; he twice received written warnings; and he had negative customer evaluations, unacceptable customer service scores, and "customer service issues."

While Plaintiff essentially argues that he would have been able to perform his job satisfactorily if he had received the same number and types of referrals as the female MLOs allegedly received, if the Empower system worked more efficiently, and if other people did their jobs faster and more efficiently so that loans could be processed and closed faster, the undisputed facts are that: Defendant had an "open architecture" system for referrals that allowed employees to use their discretion to send internal referrals to the MLO they believed would best serve the particular customer's needs; MLOs were expected to seek out and generate other sources of business; all MLOs had to use Empower; and both Ms. Green and customers were unhappy with Plaintiff's customer service.

Despite his arguments, Plaintiff testified in his deposition that he does not believe that his performance reviews were either discriminatory or retaliatory; he concedes that the numbers upon which his reviews and warnings were based were accurate; and he does not believe that his written warnings were discriminatory. Absent a showing that he performed his job satisfactorily, Plaintiff cannot establish a prima facie claim of discrimination.

Moreover, Plaintiff cannot establish that he suffered an adverse employment action. Plaintiff has cited no action that caused a materially adverse change in a term of his employment, such as significantly diminished responsibilities, termination, a demotion evidenced by a decrease in wage or salary, a less distinguished title, or a material loss of benefits. *See Kocsis, supra.* Plaintiff was hired as an MLO, and remained and MLO until he resigned in May 2012.

18

Plaintiff did not have any of the 3 branches to which he was assigned taken away from him, and he does not allege that Defendant altered his job description, responsibilities, or compensation. Absent a showing of an adverse employment action, again, Plaintiff cannot establish a prima facie claim of discrimination.

With regard to Plaintiff's retaliation claim, Plaintiff must demonstrate each of the following: 1) he engaged in a protected activity; 2) Defendant knew that Plaintiff was exercising protected rights; 3) Plaintiff suffered an adverse employment action or was subjected to severe or pervasive retaliatory harassment by a supervisor; and 4) there was a causal connection between the protected activity and the adverse employment action or harassment. As discussed above, Plaintiff cannot establish that he suffered an adverse employment action. Additionally, Plaintiff does not aver that he was "subjected to severe or pervasive retaliatory harassment by a supervisor." Absent an adverse employment action or harassment, Plaintiff cannot establish the requisite elements to sustain his retaliation claim.

## VI.  Conclusion

For the foregoing reasons, the undersigned concludes that there are no genuine issues of material fact and that Defendant is entitled to a judgment as a matter of law. Accordingly, the undersigned recommends that Defendant's Motion for Summary Judgment be GRANTED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of

service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge